## d'Happart's Estate.

Argued May 4, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*W. W. Stoner,* with him *J. M. Stoner & Sons,* for appellants.

*Park J. Alexander,* for appellee.

OPINION BY STADTFELD, J., July 15, 1938:

Fidelity Trust Company filed its first and final account as trustee under a trust agreement dated December 1, 1924. Exceptions were filed by the remaindermen objecting to distribution by means of participation certificates under the Fiduciaries Act of 1917, Sec. 49(e), and upon hearing before CHALFANT, J., the exceptions were dismissed. Upon renewal before the court in banc, TRIMBLE, P. J., CHALFANT and MITCHELL, JJ., the exceptions to the decree nisi were dismissed and the decree affirmed in an opinion by CHALFANT, J. From that decree, the remaindermen have taken separate appeals. By stipulation of counsel, the appeal of one of the remaindermen is to control the decision in both cases.

L. F. d'Happart and M. O. d'Happart, on December 1, 1924, took the sum of $3,834 to the Fidelity Title and Trust Company of the City of Pittsburgh, and there saw Alexander P. Reed, Esq., its trust officer, and deposited with the Fidelity Trust Company, through Mr. Reed, said sum of $3,834, under the terms of a written agreement in the following form: "Received of L. F. d'Happart, of West Newton, Pennsylvania, and M. O. d'Happart, of 1306 Wesley Street, Wilkinsburg, Pennsylvania, the sum of Three Thousand Eight Hundred Thirty-Four ($3,834) Dollars, representing one-third (1/3) of the net purchase price of the property in Clairton, Pennsylvania, of which their father, Harrison d'Happart, died seized. The Fidelity Title and Trust Company is to invest this money in good first mortgages and to pay the net income received therefrom to their mother Annie d'Happart, Box 427, Greensburg, Pennsylvania, for and during the term of her natural life. Upon her death, one-half (1/2) of this fund is to be paid to L. F. d'Happart or his personal

representatives; and the other half, to M. O. d'Happart or his personal representative.

"It is understood that the Fidelity Title and Trust Company is to receive five per cent (5%) upon the income passing through its hands and no charge upon the principal, unless it becomes necessary to file an account in Court. Fidelity Title and Trust Company By (signed) Alex P. Reed, Trust Officer."

What took place between L. F. d'Happart and M. O. d'Happart, who were both present, and Alexander P. Reed, Esq., on the occasion of the deposit of this money, is a matter of sharp contradiction in the testimony. Mr. Reed stated that the two d'Happart appellants wished to have the money invested in mortgages, but says that he explained to them that the fund could be invested in the installment mortgage fund and in the mortgage pool, which investments enabled the investment of odd amounts. This statement of Mr. Reed was distinctly and flatly contradicted by both L. F. d'Happart and M. O. d'Happart, who said that Mr. Reed did not mention either the installment mortgage fund or the mortgage pool, and that they had never heard of either until after the time of their mother's death, when they went in to see Mr. Reed about getting the money, and were then told that the money had been invested in the mortgage pool and in the installment mortgage fund.

From the time of the deposit of the money in trust with the Fidelity Title and Trust Company, the said L. F. d'Happart and M. O. d'Happart had nothing to do with it, received no statement of account, were not advised as to how the money was invested, and had no communication whatever with the Trust Company until after their mother's death, a period of approximately ten years.

The money was promptly invested in the Installment Mortgage Fund (pool) on January 1, 1925, and Mrs.

d'Happart was notified of this fact by letter of January 21, 1925 and advised that statements would be rendered March and September 1st. Appellants deny not only the competency of this letter and any knowledge of its receipt, but also knowledge of the character of the investments by the Trust Company until after the death of their mother. The investment was subsequently split between two pools. Semi-annual statements of account were sent to the life beneficiary along with a check for the net income.

While 35% of the pooled mortgages had been liquidated and paid to the beneficiaries, the balance invested therein could not be disposed of and the accountant asked for distribution in kind, which the court made under sec. 49(e) of the Fiduciaries Act of 1917. The remaindermen demanded cash and refused to accept distribution in kind. Exceptions filed to the account by the remaindermen were dismissed, and this appeal taken.

The sole question in the case is whether under the terms of the above agreement and under the facts surrounding the deposit of the money in trust pursuant thereto, L. F. d'Happart and M. O. d'Happart are entitled to payment of the money which they left with the Trust Company in trust, upon completion of said trust, in cash, or whether they are bound to accept participation certificates in a mortgage pool and in an installment mortgage fund.

Appellants contend that the language of the agreement, to-wit: "Upon her death, one-half of this fund is to be paid to L. F. d'Happart, or his personal representatives, and the other half to M. O. d'Happart, or his personal representatives," entitles them to payment in cash.

We do not believe that the matter of the alleged conversation at the time of the execution of the receipt referred to becomes material in view of the construc-

tion placed by the Supreme Court on words of similar import. Whether or not Mr. Reed explained that since the sum to be invested was an odd amount, the entire amount could best be invested in the installment mortgage fund, becomes unimportant.

The appellee contends that the direction in the trust agreement that "the Fidelity Title & Trust Company is to invest this money in good first mortgages" has been fully complied with by investments made in the pooled mortgages and cites the case of *Dillon's Estate*, 324 Pa. 252, 188 A. 134. In that case, the direction was to invest in "first class mortgages on improved real estate." Objection was made to investments in participation mortgages. The court upheld the investment saying, p. 255, through Mr. Justice Drew: "It is argued that participation mortgages are not 'first class mortgages' within the meaning of testator's will. The Act of April 6, 1925, P. L. 152 has declared that participation mortgages are not, by reason of the participation feature alone, improper trust investments, although 'no estate so participating shall be deemed to have individual ownership in any bond and mortgage in such fund.' The burden of proving that purchase and allocation of the participation mortgages did not fall within the authority conferred by testator's will was upon appellant. The burden was not borne. He has shown merely that the mortgages were participating. This is, in itself, not sufficient to prevent their being 'first class,' particularly in view of the existence of statutory sanction of their legality for purposes of trust investment."

The Fiduciaries Act of 1917, Sec. 41(a) requires that for the investment of trust funds only those mortgages that are first liens and do not exceed two-thirds of the appraised valuation, etc., can be used. Appellants do not question that each individual mort-

gage in the pool or participation fund meets these requirements.

Pools are simply a group of such mortgages as the Fiduciaries Act has defined as legal for trust investments. So long as each individual mortgage complies with the specifications stated, the mere combination or pooling of a number of such mortgages does not make such investments illegal.

Appellee further contends that the remaindermen are not entitled to cash by reason of the words in the trust agreement "this fund is to be paid to, etc." The Supreme Court has squarely decided this point in *Crick's Estate,* 315 Pa. 581, 173 A. 327.

In that case a trust agreement provided that the agreement could be revoked by the donor, "but the Donor upon such revocation or alteration shall not be entitled to payment of funds so withdrawn by him until thirty days after such notice." The money deposited by the donor had been invested in the mortgage pool. He revoked the agreement and demanded cash in thirty days. The court held that he was not entitled to cash. Chief Justice FRAZER, speaking for the court said (p. 584) : "In the depressed state of the real estate market it was impossible for the trustee at the time of termination of the agreement to make prompt liquidation of its securities without injustice to other participants in the mortgage pool. In the circumstances, no duty was imposed upon the trustee other than to issue a participation certificate to the appellant stating his interest in the fund. *Had the trust agreement specifically stated that the donor might demand cash, a different situation would be presented, but no such question is involved in this appeal."* (Italics supplied).

The trust agreement does not *specifically state that cash may be demanded.* The agreement in the instant case simply states that upon death of the life tenant, "this fund is to be paid." In the Crick case the court

affirmed distribution by participation certificates on the ground that the trust agreement did not specifically state that the donor might demand cash.

Appellant contends that the Crick case turns upon the fact that the donor himself dictated the manner of investment. In the instant case, the court below, in its opinion states: "There was no guaranty to pay the principal upon the death of the life beneficiary. The trust company obligated itself, in this event, to pay one-half of 'this fund' to each of the remaindermen. *When the fund was deposited it was cash, but at the termination of the trust it was mortgages, and it was in this form by reason of the direction of the remaindermen.* Reasons satisfactory to the court for the non-conversion of the securities were given, and distribution was made in kind in accordance with Section 49 (e) of the Fiduciaries Act of 1917." (Italics supplied). We do not believe that the court made this statement as a finding of fact based on the alleged conversation at the time of the execution of the agreement, but rather upon the construction of the instrument itself, and following the decisions of the Supreme Court. The words in Crick's agreement, as quoted by the Supreme Court at p. 583 are: "The Trustee shall invest said funds in *first mortgages* on real estate in so far as it is able to do so." In upholding the investment in the same mortgage pool for Crick's trust, Chief Justice Frazer said (p. 586): "Nothing has been done by the trustee contrary to law or in violation of its agreement with appellant."

The trust agreement in the Crick case was revocable and provided for the payment of funds on thirty days' notice. In the present case, the agreement is not revocable and was to endure for an indefinite period of time, to-wit: during the lifetime of the mother, Annie d'Happart. From the very nature of a life estate, as distinguished from a trust for a definite period of time or one which is revocable upon a certain period of

notice, a fiduciary is not compelled to have an investment mature at the time a life estate ends because of the impossibility of so investing in legal investments such as bonds and mortgages.

The trustee's position on this point is well set forth in the language of the Supreme Court in the opinion in *Osterling's Estate*, 324 Pa. 167, 188 A. 180. In that case the agreement provided that on the death of the donor, "the whole of the estate then held in trust shall go to the executor named in my last will and testament." The executor demanded payment in cash, which the court refused, saying in an opinion by Mr. Justice MAXEY, pp. 167, 170: "The learned court below correctly found as follows: 'The agreement contains two separate and complete methods of distribution of the corpus of the estate; one, upon the settlor's death, and the other upon revocation by him. Having provided for payment of the income, the settlor then designated who should receive the corpus on his death, but there is no requirement that the trustee pay this fund in cash. If it contained nothing more the trustee could only be called upon to turn over the fund in kind: *Crick's Estate*, 315 Pa. 581. (173 A. 327).' . . . . . .

"The court below rightly held that the executors were required to take in kind the corpus of the trust. There was nothing in the language of the agreement which required the trustee upon Osterling's death to turn over to the executors the amount of the cash the settlor Osterling originally placed in the trustee's hands for investment. *Only unequivocal language could impose on the trustee such a heavy and unusual obligation.*

"The language of the agreement invoked here does not provide for the payment of the trust estate in cash upon the settlor's death, but provides that upon his death 'the whole of the estate then held in trust shall go to the executor named in his last will and testament.' It is clear from this language that the trustee dis-

charged its entire duty when it turned over to the executors *whatever estate it held in trust at the time Osterling died.*" (Italics supplied).

Appellants rely chiefly on *Roberts' Trust Estate,* 316 Pa. 545, 175 A. 869; *Osterling v. Commonwealth Trust Co.,* 320 Pa. 67, 181 A. 769; and *Topham v. Potter Title & Trust Co.,* 324 Pa. 140, 188 A. 299. These cases all differ in some material respect from the case at bar and are not controlling.

There are three chief points of difference, one or more of which is present in all of the foregoing cases: (1) The trust agreement provided specifically that payment should be made in cash in the first two cases; (2) The agreement was revocable after notice, in all three; (3) A definite guarantee of payment was given by the trustee with the privilege of revocation in the Topham case.

In *Roberts' Trust Estate,* supra, the deed provided: "It is understood and agreed that this trust shall continue until terminated upon thirty days' notice given in writing by either of the parties hereto, and the Trustee shall thereupon pay over, transfer and deliver unto me the said trust estate in cash for investments made by the trustee ......" The court in deciding the case said, through Mr. Justice LINN, at p. 549: "Without the promise to pay in cash the trustees' duty on termination could have been performed by turning over the trust investment: *Crick's Estate,* 315 Pa. 581, 173 A. 327." Thus it is to be noted that in addition to the agreement in the Roberts case being revocable, it specifically provided for *payment in cash,* thus differing in two material respects from the present case.

Precisely the same features are present in *Osterling v. Commonwealth Trust Co.,* supra. In that case the agreement provided that settlor might "from time to time withdraw any or all of said funds. When and as the (settlor) desires to withdraw funds from invest-

ments under this agreement, the (trustee) agrees to pay over the amounts requested to him *in cash* and itself to assume the mortgages wherein the funds were invested." Each party reserved the right to revoke the agreement in whole or in part "upon giving 30 days' notice of such intention to the other party." Upon revocation by the settlor the trustee resisted payment of cash and among other defenses relied on the defense of ultra vires. Again the court ruled that this was not a sufficient defense, citing the Roberts case. The court also took cognizance of the fact that the agreement was revocable and could be terminated at a definite time (p. 71): "Not only did the contract require the investments to be made on terms that would enable defendant to perform its obligation to plaintiff, but it was also implicit in the agreement that defendant should so watch over the investment as to be able to comply with the contract."

Both the Roberts case and the *Osterling v. Commonwealth Trust Co.* case were decided on the basis that the agreements called specifically for cash, and that such agreements were not ultra vires. And the case of *Topham v. Potter Title Trust Co.*, supra, strongly relied on by the appellant, was decided on the basis of these two cases. In fact the entire opinion in the Topham case was as follows: "Per Curiam, November 23, 1936: Affirmed on the opinions in *Osterling v. Com. Trust Co.*, 320 Pa. 67, and *Roberts' Trust Estate*, 316 Pa. 545. Judgment affirmed."

The Supreme Court considered that the Topham case was one where the trustee specifically guaranteed the principal sum within three months after demand, and that such a contract is not ultra vires. The trust agreement in that case provided as follows: "That the said party of the second part in consideration of the terms of the guarantee hereinafter mentioned, guarantees to the party of the first part as follows: First: Pay-

ment of the principal sum within three (3) months after the same has been demanded by the party of the first part. Second: Payment of income on said principal sum of Seven thousand ($7,000) Dollars at the rate of five (5%) per cent per annum, payable semi-annually ......." It is to be noted that the word "guarantee" is used when speaking of payment of the principal sum.

The Topham case is nothing more than application of the rule that a trustee may promise to make distribution in cash and that the words used in the agreement are subject to this interpretation by reason of the fact that the trustee *guaranteed the principal sum* as well as the income at 5%. These features are not present in the case at bar. The d'Happart agreement contained no provision for revocation and it did not guarantee payment of the principal sum or income. It simply provides that "this fund shall be paid etc." There is no such element of guarantee present as would lead the court to construe the words "this fund" to mean cash. And there is no provision for revocation at a definite time. The trust here endured for an indefinite period, to-wit, a life estate, and there is no implication in the agreement that the trustee must hold itself in readiness upon due notice to convert the fund into cash. The Topham case presents a different factual situation and falls under the line of cases established by *Roberts' Trust Estate,* supra. The d'Happart case is governed by the rule laid down in *Crick's Estate,* 315 Pa. 581, to-wit, that the trust agreement must specifically state that the *donor may demand cash.*

The appellant also cites *Kefover v. Potter Title and Trust Co.,* 320 Pa. 51, 181 A. 771. In that case, as in the others, the trust agreement provided for revocation by the settlors and stated ...... "The trustee shall have a reasonable time in which to convert the investments into cash." On demand by the settlors the trustee

was unable to convert the investment and was threatened with suit. In consideration of forebearance of suit by the settlors the trustee agreed to pay the balance admitted to be due in certain installments. The suit was brought when the trustee failed to comply with this subsequent contract. Suit was not based on the trust agreement. The case is therefore materially different from the case at bar and not applicable.

We may appropriately quote from the opinion in *Guthrie's Estate*, 320 Pa. 530, 182 A. 248, at p. 538: "The loss which the exceptants have suffered, if any, has in no way been the result of the breach of trust here complained of, but, for all that appears, would have been nonetheless incurred had the mortgages been carried properly from the start. Clearly the exceptants should not be permitted to shift their loss to these trustees. It would be unconscionable to require the trustees to account in cash under the facts of this case. No court of equity should permit it. The exceptants have at most suffered what may be only a temmporary loss, and that solely because of the economic conditions of the times and the consequent general shrinkage in values. They would nonetheless ignore the good faith and sound business judgment of the trustees, who have made full disclosure of their conduct of the trust, and would take advantage for their own gain of a technical violation of law by the imposition of penalties therefor. The court below was plainly right in rejecting their claim."

We have read with a great deal of interest the very able brief on behalf of appellant, but we are constrained to follow what we believe is the correct interpretation as set forth in the cases cited from the Supreme Court.

The assignments of error are overruled and the decree of the lower court affirmed at cost of appellants in each appeal.